1
2
3
4
5
6
7
8               **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WILLIAM W. COPELAND,                      No. CIV S-08-2464-CMK

12                  Plaintiff,

13          vs.                                <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                    Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Doc. 24) and defendant's cross-

23   motion for summary judgment (Doc. 28).

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on November 22, 2005.  In the application, plaintiff claims that disability began on October 1, 2005.  Plaintiff claims that disability is caused by a combination of: "Bipolar I; Bipolar Mixed; Bipolar II, recurrent major, with depressive and hypomania episodes; personality disorder; and borderline personality traits."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 14, 2007, before Administrative Law Judge ("ALJ") James A. Mitchell.   In a April 23, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.  The claimant has the following severe impairments: bipolar disorder, alcohol abuse, and substance abuse disorder;

2.  The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.  The claimant has the residual functional capacity to perform the full range of work at all exertional levels but with the following non-exertional limitations: his attention, concentration, understanding, and memory are slightly limited; his ability to do simple routine repetitive tasks is slightly limited; he requires occasional close supervision for more than two hours on a work shift due to his non-compliance with his medication regime and drug and alcohol abuse; he is able to lift up to fifty pounds occasionally and twenty five pounds frequently;

4.  Considering the claimant's age, education, work experience, and residual functional capacity, and based on vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on August 19, 2008, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

2

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

October 3, 2005 – A contact sheet completed by staff at San Joaquin County Mental Health reflects that plaintiff's current GAF was 50.  On mental status examination, plaintiff's mood was depressed, thought content was clear, and memory was intact.  Plaintiff reported having used methamphetamine three weeks prior and marijuana four days prior.

October 11, 2005 – Notes from San Joaquin County Mental Health indicate that plaintiff reported initially complaining of insomnia but then added he needs an antidepressant. He reported mood swings and intermittent suicidal ideation.  Plaintiff said he had recently broken up with a physically abusive boyfriend.

October 25, 2005 – Chart notes from San Joaquin County Mental Health indicate that plaintiff reported Depakote was making him dizzy and oversedated.  However, he also stated that he does not sleep well at night despite being tired all day.  The diagnosis indicated on the chart note is "Mood D/O NOS R/O Bipolar II."  Plaintiff was prescribed Zyprexa.

November 23, 2005 – Records from San Joaquin County Mental Health indicate that plaintiff failed to attend his appointment the day before with his treating physician, Dr. Graff, and that he walked in because he ran out of medication.  Plaintiff reported that he was doing good and that medication was helping him sleep.  Plaintiff said that he was experiencing increased depression, but firmly denied any suicidal ideation.  Plaintiff was cooperative and denied any acute distress.  Plaintiff was provided medication.

January 2, 2006 – The CAR contains a "Function Report – Adult – Third Party" submitted by plaintiff's sister, Jamie Copeland.  She stated that plaintiff spends most of his day sleeping and, when not sleeping, he eats and watches television.  Ms. Copeland stated that plaintiff is "dependent on others to cook, due to tiredness and side effects [of medication]."  She added that he needs help remembering to take his medication because he "forgets track of time."

Ms. Copeland also stated that plaintiff cannot cook for himself because of "drowsiness, muscle aches, lack of motivation." She stated that plaintiff does his own laundry once a month, but doesn't go out to do any kind of shopping. She also stated that he is moody with "highs & lows" and that plaintiff is emotional and depressed.

As to functional capabilities, Ms. Copeland stated that plaintiff's impairments make it difficult for him to lift, talk, complete tasks, concentrate, understand, and get along with others. She stated that plaintiff could maybe walk a mile before needing rest. She added that he is easily distracted and cannot pay attention for long, though she stated he had no problems following written or spoken instructions. Ms. Copeland stated that plaintiff does not handle stress well.

January 4, 2006 – The CAR contains a "Contact Sheet" prepared by staff at San Joaquin County Mental Health. The document indicates that, at that time, plaintiff's GAF score was 50 and had remained unchanged over the past year. On mental status examination, it was noted that plaintiff was cooperative. His mood was reported as "tired." Plaintiff had a nervous affect. Thought content was appropriate. Memory and abstraction were both good. Plaintiff denied drug and/or alcohol use. Plaintiff reported suicidal ideation, but no plan, and that he wants to cut himself.

January 6, 2006 – Plaintiff provided responses on a "Function Report – Adult" submitted with his application for benefits. Plaintiff stated that he lives with his family. For daily activities, plaintiff stated: "I wake up and watch T.V. and eat if some one cooks." He added that lately he hadn't been "feeling good do to my meds." He stated that he needs reminders to take his medications. He also stated that he bathes once a week, does laundry once every other week with assistance, doesn't do anything with his hair, does not shave, and his mother cooks meals for him. Plaintiff stated that, before the onset of disability, he was more energetic and able to think more clearly. He states his impairments cause him to "get dizzy and drozie." When asked, however, to check boxes next to various activities his impairments prevent or limit (such

as lifting, stooping, sitting, etc.), plaintiff did not check any boxes or otherwise indicate any limitations.[1]  Plaintiff added that he does not handle stress well due to "anxieties and panic attacks."  Plaintiff concluded his statement by adding: "I am trying to fix these problems."

January 11, 2006 – San Joaquin County Mental Health records reflect that plaintiff failed to attend this scheduled appointment.

February 22, 2006 – Chart notes from San Joaquin County Mental Health reflect that plaintiff had missed at least four of his last appointments.  The notes refer to "chronic missed MD appts."

February 28, 2006 – Chart notes from San Joaquin County Mental Health reflect that plaintiff had stopped taking his medications.  The notes also state: "Pt. was drinking a couple weeks ago."

April 27, 2006 – Agency examining doctor David C. Richwerger, Ed.D., reported on a comprehensive psychiatric evaluation.  The doctor reported the following history:

> The claimant denies ever being admitted to a psychiatric hospital.  The claimant states he has gone to the Crisis Center at Mental Health when he was sixteen to see a counselor.  The claimant states he began some outpatient psychiatric treatment in October 2005.  He states his friends referred him because he was "climbing the walls, crying, and getting angry."  He states his last visit was with Dr. Graff in earlier April 2006.
>
> The claimant states he has difficulty concentrating and difficulty with his memory.  He states, "Not always.  It just depends."  The claimant states in the past he thought he heard voices.  He states, "For a while I did, but I don't hear them now."  The claimant then stated he was not actually hearing it.  The claimant may have been referring to his own thoughts.  The claimant states he has troubling thoughts.  The claimant states he often feels anxious and depressed.  The claimant states he is not always depressed but often has anxiety in public.  The claimant denies suicidal ideation but says he had suicidal thoughts about a month ago.  He states at the age of 17 or 18 he tried to get hit by a car.  The claimant denied homicidal ideation in the past but none at this time – just when he gets very angry.  The claimant states he had seen Dr. Graff once a month and now his appointments with him are p.r.n.  The claimant states he was prescribed Depakote and Prozac.  The claimant states the Depakote makes

---

[1]     It appears that plaintiff may have neglected to answer any of the questions on page 8 of 10 of the pre-printed form questionnaire.

1        him more stable than before.

2  Plaintiff told the doctor that "he used to drink a lot at the age of 16 but does not drink at all now."

3  He last used drugs when he was 16.  As to current functioning, Dr. Richwerger reported:

4        The claimant lives in a house with his family.  The claimant states he does
   not sleep very well.  He has often had problems sleeping and he does not

5  know why.  He states his appetite varies a lot.  The claimant states he does
   household chores such as washing clothes and drying them on the line.  He

6  takes care of his own personal needs.  The claimant states he has no
   outside activities or hobbies.  The claimant states he handles his own

7  financial affairs.  The claimant states he usually gets around by getting a
   ride.  The claimant is able to move about alone.  The claimant's mother

8  drove him to this evaluation.  The claimant states he does not interact that
   well with family and relatives.  Things vary a lot.  He avoids friends and

9  neighbors.  The claimant states what he does just depends on the day.
   Nothing is consistent.  The claimant states, "Lately, I have been cleaning a

10 lot.  Sometimes, I am depressed.   Sometimes, I have a lot of energy."  The
   claimant states his last schooling was last year.

11

12 Based on mental status examination results, Dr. Richwerger diagnosed bipolar II, mixed, and

13 assigned a GAF of 55.  The doctor outlined the following functional assessment:

14       The claimant appears to have a moderate impairment in his ability to
   perform detailed and complex tasks.

15

16 The claimant appears to have no impairment in his ability to perform
   simple and repetitive tasks.

17 The claimant appears to have a slight impairment in his ability to perform
   work activities on a consistent basis.

18

19 The claimant appears to have no impairment in his ability to perform work
   activities without special supervision.

20 The claimant appears to have a moderate impairment in his ability to
   complete a normal workday or workweek without interruption from a

21 psychiatric condition.

22 The claimant appears to have a slight impairment in his ability to
   understand and accept instructions from supervisors.

23

24 The claimant appears to have a slight impairment in his ability to interact
   with co-workers and the public.

25 The claimant appears to have a slight impairment in his ability to maintain
   regular attendance in the workplace.

26

1       The claimant appears to have a slight impairment in his ability to deal with
2       the usual stresses encountered in competitive work.

3       July 26, 2006 – Agency consultative doctor V.M. Meenakshi, M.D., submitted a

4   psychiatric review technique form.  Plaintiff was assessed with mild difficulties in activities of

5   daily living and social functioning.  The doctor opined that plaintiff is moderately limited in

6   ability to maintain concentration, persistence, and pace.  There was insufficient evidence to

7   establish episodes of decompensation.  The doctor also completed a mental residual functional

8   capacity assessment.  Dr. Meenakshi opined that plaintiff was moderately limited in ability to

9   understand, remember, and carry out detailed instructions.  In all other categories of functioning,

10  plaintiff was assessed as not significantly limited.

11      September 12, 2006 – Records from San Joaquin County Mental Health indicate

12  that plaintiff reported using marijuana at age 15 and later methamphetamines.  Plaintiff stated

13  that he last used methamphetamine in September 2005.

14      November 27, 2006 – Chart notes from San Joaquin County Mental Health

15  indicate that, on mental status examination, plaintiff appeared to be very intelligent.  His attitude

16  was angry, speech normal, mood depressed, and thought content clear.  Plaintiff denied

17  hallucinations.  He said he had not been sleeping and admitted to suicidal ideation.  The notes

18  indicate that, at the time, plaintiff was taking Zoloft, Seroquel, and Hydraxine.

19      December 21, 2006 – Plaintiff reported to a case worker from San Joaquin County

20  Mental Health that his medications were working well and he denied any depression at the time.

21      January 12, 2007 – Progress noted from San Joaquin County Mental Health reveal

22  the following comment by plaintiff's case manager:  "He admits to struggling with

23  methamphetamine abuse, but has been clean for several months."

24      January 19, 2007 – Records from San Joaquin County Mental Health indicate that

25  plaintiff called in to cancel his therapy appointment because he had the flu.  He denied any

26  psychiatric problems.

1    January 30, 2007 – Plaintiff reported to a case manager from San Joaquin County

2 Mental Health that he had been feeling depressed and that he reported to a crisis center the week

3 before because he started "cutting" himself.  He denied feeling suicidal.

4    February 9, 2007 – Plaintiff told a case manager from San Joaquin County Mental

5 Health that he felt his medications had been effective since being changed the week prior.

6 Plaintiff denied experiencing any anxiety attacks or episodes of self-abuse.

7    February 13, 2007 – Plaintiff reported to a case manager from San Joaquin County

8 Mental Health that he had not taken his medications for a few days and that he was "not good."

9 Plaintiff stated that he did not feel his medications were working.

10    February 15, 2007 – Notes from San Joaquin County Mental Health indicate the

11 following:

12    Case manager met with client at HEART Office.  He was appropriately
     groomed, alert, and oriented x 3.  He said he was feeling much better
13    today.  He denied feeling depressed and denied any desire to harm himself.
     He said he went home Tuesday and slept after taking his meds.  He is
14    continuing his med regime now.  He also attended group today. . . .

15    February 22, 2007 – Chart notes from San Joaquin County Mental Health

16 indicate:

17    Case manager met with client at HEART Office.  He was well groomed,
     alert, and oriented x 3.  He reported he is doing much better.  He started
18    taking his meds as prescribed and denies adverse effects.  He said he feels
     much calmer and has slept much better since taking his meds.  Case
19    manager engaged him in conversation about med education.  He said he
     wants to change his meds to better stabilize his meds. . . .

20

21 Plaintiff was encouraged to "continue working on recovery for his mental illness and drugs."

22    February 27, 2007 – Plaintiff reported to mental health staff at San Joaquin

23 County Mental Health that he finds himself "crying for hours on end about my flashbacks."

24 Plaintiff also reported feeling "insulted that his sister's boyfriend, Brendan, wants to have sex

25 with him."  Chart notes indicate that plaintiff and his case manager discussed employment and

26 plaintiff said he wanted to try the "moving crew."

February 28, 2007 – Progress notes from San Joaquin County Mental Health reveal as follows:

> Case manager met with client when we were done moving.  He said he is going well and his mood has been stable.  Right now his meds are working and he has no complaints. . . .

March 20, 2007 – Progress notes from San Joaquin County Mental Health reflect that plaintiff had stopped attending the community skills building group class and that plaintiff "gives many somatic complaints . . . as reasons not to work toward his goal at this time."

March 23, 2007 – Progress notes from San Joaquin County Mental Health reveal that plaintiff was feeling good "because he just had a good session with his therapist."  Plaintiff's case manager helped him move his belongings to Sutter Manor.

March 27, 2007 – Progress notes from San Joaquin County Mental Health indicate that plaintiff attended a hockey game with staff from and other members of the HEART Program.  Plaintiff appeared to enjoy the game and was observed interacting with staff and peers appropriately.

April 2, 2007 – Notes from a group therapy session reflect the following:

> Client was late to group and very disruptive.  Client came into group apologizing for being late and talked over the person who was speaking.  After sitting down the client continued to respond to internal stimuli, and then got up to get a drink and began talking louder.  Client was asked to leave group and was escorted to Crisis by Security.

April 3, 2007 – Chart notes from San Joaquin County Mental Health reflect:

> Case manager met with client at HEART Office.  He appeared in better spirits as he was smiling and laughing with his friends.  He said he was feeling much better today because he "prayed and did push ups" last night.  He feels this helped center his mind.  Case manager engaged him in conversation about the importance of taking care of oneself physically.  Case manager also encouraged him to attend the Spirituality Group on Wednesdays with Allies.  He stated he would try to make it and expressed his desire to learn more spirituality.  He appeared neutral in mood and stable.

April 6, 2007 – Chart notes from San Joaquin County Mental Health indicate that plaintiff had been arrested several months ago for shoplifting.

1          May 18, 2007 – Chart notes from San Joaquin County Mental Health reflect that

2    plaintiff admitted not taking his medications as prescribed.  Plaintiff also reported that he felt

3    attending group sessions was helping, though he "feels stuck sometimes."

4          May 21, 2007 – Notes from San Joaquin County Mental Health indicate:

5          Case manager met with William at his room at Sutter Manor.  He was
      appropriately groomed, alert, and oriented x 3.  He said he is feeling ok

6          today but continues to battle with his depression.  He stated he is
      committed to trying his Tegretol as prescribed for two weeks to see if it

7          helps his depression.  He said he is in a new relationship and was having
      some problems with him.  Case manager listened and provided supportive

8          counseling emphasizing med education, and boundaries.  He said he is
      trying to focus on himself as much as possible.  Case manager also

9          counseled him regarding med education.  William said he realizes when he
      gets depressed, he begins to isolate.  Case manager encouraged him to

10         commit to attending a minimum of one group a week to help him break
      the cycle of isolating.  He said he would either come on Tuesday or Friday.

11         We also discussed where he was in applying for his SSI.  He said he is
      waiting for a letter from SSI regarding a court date for appeal.  William

12         appears depressed, but stable.  Will continue to follow up as needed.

13         June 21, 2007 – San Joaquin County Mental Health progress notes reveal the

14   following comment by the staff case manager: "Client has difficulty taking responsibility for

15   himself and uses his mental health issues as a means to get what he wants."

16         July 3, 2007 – Chart notes from San Joaquin County Mental Health indicate that

17   plaintiff was assaulted while attending a gay pride parade two weeks earlier.  Plaintiff reported

18   that he thinks someone put something in his drink of "ETOH."[2]  He said he woke up with no one

19   around and in severe pain.  He reported rectal bleeding since the incident.  Plaintiff was tearful

20   and stated he felt ashamed.  Plaintiff's mood was reported as "severely depressed."  Vegetative

21   symptoms of lack of appetite and excess sleep were also reported.  Plaintiff was referred to the

22   hospital for a physical evaluation.

23   / / /

24   / / /

25   _____

26       [2]     "ETOH" is a medical abbreviation referring to alcohol.

1          <u>July 25, 2007</u> – The CAR contains chart notes from San Joaquin County Mental

2   Health reflecting that plaintiff's speech was low and soft, his mood was calm, and plaintiff

3   denied hallucinations or suicidal ideation.  Memory and abstraction were both good.

4          <u>August 7, 2007</u> – The CAR contains a psychiatric admission note prepared by

5   Muhammad Zia, M.D, a psychiatrist with San Joaquin County Mental Health.  Dr. Zia reported

6   the following history:

> The patient is currently under the care of Dr. Rizvi in the Outpatient
> Clinic.  It appears that there have been rapid med changes, initiated at
> patient's request with vague complaints of side effects and intolerability.
> He took an overdose on his medication and was medically cleared at St.
> Joseph's Medical Center.  The patient says, "I'm tired of my life and don't
> want to live; don't know what I will do after I go home."  The patient is
> vague about any precipitating factors to his depression.  There is no clear
> indication of vegetative symptoms of depression recently.  The patient
> tends to be vague, somewhat confused, ambivalent, and paranoid.  He does
> not express his emotions well.  He had difficulty in answering my
> questions adequately.  The patient said that he is living at Sutter Manor
> and is on G.R.  His SSI Disability is pending.  The patient has been
> declining in his functioning over the last few years.  He has not been able
> to graduate from high school and has no ability for gainful employment.
>
> The patient is vague about his past history of suicidal attempts.  He denies
> hearing voices.

16   On mental status examination, the doctor reported the following:

> On admission the patient is oriented and alert but rather sullen and
> concrete with minimal verbalization.  He is vague and evasive in his
> presentation.  His affect is restricted; his mood is depressed.  He denied
> any further suicidal impulses at this time.  His cognitive and intellectual
> functions are grossly intact.

20   Plaintiff was diagnosed with Bipolar Disorder, Type I, recurrent severe as well as personality

21   disorder NOS.  Plaintiff's GAF was "Poor, 20/40."

22          <u>August 20, 2007</u> – Notes from San Joaquin County Mental Health indicate that

23   plaintiff had been put on "weekly med-compliance" due to failure to take his medications as

24   prescribed.  Despite plaintiff's stated refusal to participate in drug rehabilitation, therapy, or

25   support groups, the notes reflect that plaintiff was making "some progress."

26   / / /

1        <u>August 27, 2007</u> – Chart notes from San Joaquin County Mental Health reflect as

2    follows:

3        Client was on time and neatly dressed and groomed for his appointment.
         Client reported that he had a good weekend.  That one of his nephews
4        came and spent the night.  Client sees being involved in his niece and
         nephews lives as a positive and that he is able to set appropriate
5        boundaries and limits with them.  Client also states that his mother, sister,
         and aunt fought and that instead of trying to be the peace maker he did not
6        get involved and let them work things out and that this was much less
         stressful for him.

7

8    The notes indicate that plaintiff was making "some progress" towards his mental health goals.

9        <u>August 28, 2007</u> – Notes following plaintiff's attendance at a group therapy

10   session indicate: "Clt. was appropriate & an active participant in the group discussion.  He

11   appeared to understand the concepts being presented."

12       <u>September 7, 2007</u> – Notes from San Joaquin County Mental Health state:

13       . . . Client reported things had gone well this week and though the only
         group he attended was the Spirituality Group which he really enjoyed.
14       Client reports that he has been going to the gym for 6-8 hours a day to
         work out, use the sauna and then work out again.  Client stated that he
15       liked how it made him feel. . . .

16   Plaintiff stated that he felt he has made many changes.  The notes reflect problems with

17   medication compliance.  The notes also reflect that, generally, plaintiff was making "some

18   progress."

19       <u>September 11, 2007</u> – Notes from San Joaquin County Mental health indicate:

20       . . . Client reported doing well.  Client reported that he often goes to the
         gym during the week and feels calmer each time. . . .
21

22   The chart notes indicate that plaintiff was making "clear progress."

23   / / /

24   / / /

25   / / /

26   / / /

1        September 19, 2007 – Plaintiff walked in to San Joaquin County Mental Health

2  after missing his doctor's appointment the day before.  Plaintiff stated that he had run out of

3  medication.  Plaintiff's speech was flat, his mood was depressed and tired, and plaintiff denied

4  any hallucinations or suicidal ideation.  Additional chart notes indicate as follows:

5
> . . . Client expressed frustration with feeling pressured to attend several
> groups each week and two individual therapy sessions per week as
> suggested by his therapist.  Client described himself as being bored,
> impulsive, and having made decisions lately that he regrets. . . .

6

7

8  The chart notes indicate that plaintiff was making "some progress."

9        September 21, 2007 – Chart notes from San Joaquin County Mental Health

10  indicate that plaintiff did not show up for his appointment.

11        October 1, 2007 – Chart notes from San Joaquin County Mental Health indicate

12  that plaintiff did not show up for his appointment.

13        October 25, 2007 – Chart notes from San Joaquin County Mental Health state:

14
> Client stopped by the office looking for conversation while waiting to pick
> up his medication.  Client reports that he has not been attending groups or
> therapy but has been spending time learning about Borderline Personality
> Disorder.  Client shared that it has helped him to understand why he does
> some of his behaviors that are impulsive and risky.  Client states that
> overall he has been feeling okay.  He has had a few times that he has
> thought about suicide but he talks about it to someone he trusts and does
> not act on it.  Client processed feelings about how the information is
> helping him to view his mother in a different light.

15

16

17

18

19  The notes indicate that plaintiff was having problems with medication compliance.  The notes

20  also indicate that plaintiff was making "some progress" towards his mental health goals.

21        November 21, 2007 – Records from San Joaquin County Mental Health reflect

22  that plaintiff reported "ongoing suicidal thoughts but has been unable to control them."  Plaintiff

23  requested placement in a facility that could provide a structured environment.

24  ///

25  ///

26  ///

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV.  DISCUSSION

Plaintiff summarizes his arguments as follows:

> The ALJ committed four principal errors in finding Mr. Copeland "not disabled."  First, Mr. Copeland's psychiatric impairment met or equaled the requirements under 12.04 of the listing of impairments.  Second, the ALJ failed to accurately characterize the medical evidence and credit the opinions of the treating psychiatrists without a legitimate basis for so doing.  Third, the ALJ rejected Mr. Copeland's and third party statements regarding his functional limitations without providing clear and

14

1   convincing reasons for so doing.  Fourth, the ALJ failed to properly assess
2   Mr. Copeland's residual functional capacity (RFC) and pose a legally
    adequate hypothetical to the vocational expert.

3   **A.      Evaluation of Medical Opinions**

4           The weight given to medical opinions depends in part on whether they are

5   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

6   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

7   professional, who has a greater opportunity to know and observe the patient as an individual,

8   than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

9   (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

10  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

11  (9th Cir. 1990).

12          In addition to considering its source, to evaluate whether the Commissioner

13  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

14  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

15  uncontradicted opinion of a treating or examining medical professional only for "clear and

16  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

17  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

18  by an examining professional's opinion which is supported by different independent clinical

19  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

20  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

21  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

22  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

23  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

24  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

25  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

26  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

1   without other evidence, is insufficient to reject the opinion of a treating or examining

2   professional. See id. at 831.  In any event, the Commissioner need not give weight to any

3   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

4   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

5   see also Magallanes, 881 F.2d at 751.

6           Regarding medical opinion evidence from treating, examining, and consulting

7   sources, the ALJ stated:

8           As for the opinion evidence, progress notes reported on January 27, 2006,
            that the claimant had a GAF of 35 and on August 7, 2007, and November
9           21, 2007, a GAF of 40.  (Exhibit 9F pages 3, 31, and 125).  On August 7,
            2007, Dr. Zia reported that the claimant had a GAF of 20/40 on admission
10          to the hospital.  (Exhibit 9F page 30).  Progress notes reported on August
            23, 2006, January 24, 2007, July 2, 2007, that the claimant had a GAF of
11          45.  (Exhibit 9F pages 47, 101, and 151).  A San Joaquin County Mental
            Health Services psychiatric intake assessment on September 12, 2006,
12          reported that the claimant had a GAF of 45.  (Exhibit 9F page 132).
            Pursuant to 20 CFR § 404.1527 and Social Security Ruling 96-2p, the
13          undersigned assigns significant weight to these opinions, as they are well-
            supported by the medical evidence finding that the claimant's symptoms
14          are aggravated when he is non-compliant with his medication regime and
            abuses alcohol and drugs.
15
            Progress notes reported on October 3, 2005, January 4, 2006, June 12,
16          2006, that the claimant had a GAF of 50.  (Exhibit 1F pages 2 and 11, 9F
            page 158).  Dr. Richwerger reported on April 27 2006, that the claimant
17          had a GAF of 55.  (Exhibit 2F page 5).  Progress notes reported on March
            31, 2006, that the claimant had a GAF of 55.  (Exhibit 9F page 160).
18          Pursuant to 20 CFR § 404.1527 and Social Security Ruling 96-2p, the
            undersigned assigns significant weight to these opinions, as they are well-
19          supported by the medical evidence finding that the claimant had moderate
            mental impairment symptoms when he is compliant with his medication
20          regime and abstains from alcohol and drugs.

21          Scott Harrison, MHC-1, reported on September 9, 2007, September 11,
            2007, September 19, 2007, September 24, 2007, September 28, 2007, that
22          the claimant's symptoms limited his ability to maintain regular
            employment and put him at a significant risk of being exploited and for
23          physical injury.  (Exhibit 9F pages 10, 14, 17, 20, and 22).  A treating
            physician's medical opinion, on the issue of the nature and severity of an
24          impairment, is entitled to special significance; and, when supported by
            objective medical evidence and consistent with otherwise substantial
25          evidence of record, entitled to controlling weight.  (citation omitted).
            However, statements that a claimant is 'disabled', 'unable to work' can or
26          cannot perform a past job, meets a listing, or the like are not medical

opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the *Dictionary of Occupational Titles*.  Such issues are reserved to the Commissioner.  (citation omitted)  Furthermore, Mr. Harrison is not a physician or psychologist, apparently only the claimant's therapist and the record fails to support the therapist's opinion that the claimant is incapable of work.

A *Psychiatric Review Technique* dated July 26, 2006, by V.M. Meenakshi, M.D., a State psychiatric consultant, found that the objective medical evidence supported a finding that the claimant had medically determinable bipolar disorder.  The claimant was found to be mildly limited in activities of daily living and maintaining social functioning and have moderate difficulties in maintaining concentration, persistence, or pace, and have no episodes of decompensation.  The claimant was not found to have a history of chronic organic mental disorder.  (Exhibit 5F).

A *Mental Residual Functional Capacity Assessment* of the same date by Dr. Meenakshi found that the objective medical evidence supported a finding that the claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions.  The claimant was found not [to] be significantly limited in all other areas of mental activity.  The claimant was found to have the ability to carry out simple tasks.  (Exhibit 6F).

The State psychiatric consultant opined that the claimant functions in a generally independent fashion and can meet various personal needs from a mental standpoint.  The claimant is capable of completing daily living functions with the constraints of their medical condition.  The claimant manages with a basic routine.  The claimant can relate to others and is capable of showing socially appropriate behaviors and negotiating in the community.  The claimant is capable of functioning in a competitive work environment.  The undersigned . . . has assigned significant weight to these opinions because they were based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein.  They are well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings aswell as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations.  Moreover, the opinions are not inconsistent with other substantial evidence of record.

Plaintiff argues that the ALJ erred because: (1) no doctor ever concluded that plaintiff's problems were attributable to either non-compliance with medication or substance abuse; and (2) the record documents plaintiff's diagnosis of bipolar disorder and related symptoms.  In sum, plaintiff argues that the ALJ "played doctor" and substituted his medical opinions and conclusions for those of the treating sources.

17

1          Plaintiff was treated for his mental health problems at San Joaquin County Mental

2    Health.  Plaintiff worked primarily with a therapist who is not a medical doctor or licensed

3    psychologist.  The record also reflects that plaintiff was treated by Dr. Zia.  In particular, Dr. Zia

4    reported on an August 7, 2007, "5150" hospitalization.  The ALJ references Dr. Zia's discussion

5    only briefly in the hearing decision by noting that Dr. Zia assigned a GAF score of "Poor, 20/40"

6    upon admission.  The ALJ does not specifically reject any of Dr. Zia's conclusions.  Of note, Dr.

7    Zia characterized his ongoing treatment of plaintiff as follows: "The patient has been declining in

8    his functioning over the last few years."  As the ALJ notes, this observation about plaintiff's

9    mental condition is entitled to "special significance" and "controlling weight" when not

10   contradicted by other evidence in the record.  However, the ALJ appears not to have assigned

11   controlling weight to this observation and the ALJ does not provide any specific or legitimate

12   reasons for ignoring or rejecting it.

13          The record reflects that plaintiff's case was reviewed by two agency doctors – Dr.

14   Richwerger, who examined plaintiff, and Dr. Meenakshi, who reviewed records.  Given that Dr.

15   Meenakshi's opinion is based entirely on Dr. Richwerger's conclusion, essentially the only state

16   agency doctor to render an independent opinion is Dr. Richwerger, whose opinion the ALJ gave

17   significant weight.  In doing so, however, the ALJ did not provide any specific analysis other

18   than to say that Dr. Richwerger's assessment is consistent with evidence that plaintiff's condition

19   is aggravated with non-compliance with medication and/or substance abuse.

20          The court does not finds that these reasons are supported by substantial evidence

21   in the record.  While there appears to be some history of non-compliance with medication, as

22   plaintiff notes no doctor ever stated that plaintiff's problems are aggravated by non-compliance

23   or made better with compliance.  A review of the entire record suggests instead that plaintiff's

24   medications were often changed due to complaints of adverse side effects.  The treatment records

25   tend to describe this process as "stabilization."  There are indications in the treatment records

26   that, at times, plaintiff's condition was improved with medication and, at other times, his

1   condition worsened while on medication.  As to substance use, the court can find no indication in

2   the record of an instance where a doctor familiar with plaintiff's case opined that plaintiff's

3   mental impairments are the result of substance abuse.

4          A remand is appropriate in order to allow the ALJ to further evaluate the medical

5   opinions.  Specifically, it would be helpful to have more analysis as to Dr. Zia's conclusions.  It

6   may be necessary to obtain a medical source statement from Dr. Zia in which the doctor sets

7   forth a specific functional assessment and supporting objective findings.

8          **B.**   **Lay Evidence**

9               1.   Plaintiff's Statements

10          The Commissioner determines whether a disability applicant is credible, and the

11  court defers to the Commissioner's discretion if the Commissioner used the proper process and

12  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

13  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

14  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

15  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

16  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

17  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

18  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

19  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

20  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

21          If there is objective medical evidence of an underlying impairment, the

22  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

23  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

24  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

25                     The claimant need not produce objective medical evidence of the
                       [symptom] itself, or the severity thereof.  Nor must the claimant produce
26                     objective medical evidence of the causal relationship between the

medically determinable impairment and the symptom.  By requiring that
the medical impairment "could reasonably be expected to produce" pain or
another symptom, the <u>Cotton</u> test requires only that the causal relationship
be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
<u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged,
including aggravating factors, medication, treatment, and functional restrictions.  <u>See</u> <u>Bunnell</u>,
947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the
claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent
testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a
prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)
physician and third-party testimony about the nature, severity, and effect of symptoms.  <u>See</u>
<u>Smolen</u>, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the
claimant cooperated during physical examinations or provided conflicting statements concerning
drug and/or alcohol use.  <u>See</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the
claimant testifies as to symptoms greater than would normally be produced by a given
impairment, the ALJ may disbelieve that testimony provided specific findings are made.  <u>See</u>
<u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's testimony, the ALJ stated:

After considering the evidence of record, the undersigned finds that the
claimant's medically determinable impairments could reasonably be
expected to produce the alleged symptoms; however, the claimant's
statements concerning the intensity, persistence, and limiting effects of
these symptoms are not credible to the extent they are inconsistent with the
residual functional capacity assessment for the reasons explained below.

In terms of the claimant's alleged disabling impairments, the record fails
to document any objective clinical findings establishing that the claimant
was not able to perform work in light of the reports of the treating and
examining practitioners and the findings made on examination.

Dr. Richwerger reported on April 27, 2006, that the claimant's thought
processes were clear, rational, and not disorganized or tangential.  He was
oriented in all spheres and understanding of instructions was within

normal limits.  His reality contact was within normal limits and there was no evidence of hallucinations, delusions, bizarre behavior, or response to internal stimuli.  (Exhibit 2F pages 3 and 5).  Progress notes reported on February 15, 2007, that the claimant denied feeling depressed and denied any desire to harm himself.  On February 22, 2007, it was reported that the claimant was alert and oriented in all spheres and that he had been taking his medications as prescribed with no adverse effects.  He stated that he felt calmer and slept much better since taking his medications.  On March 23, 2007, the claimant was feeling good because he had a good session with this therapist and he stated that he felt hopeful and more relaxed.  On March 27, 2007, it was reported that the claimant laughed and cheered at a hockey game and socialized with peers and staff appropriately.  On April 3, 2007, it was reported that the claimant was smiling and laughing with his friends.  The claimant was very social and enjoyed himself when he participated at a monthly AA speaker meeting.  It was reported that the claimant was five months sober.  On September 7, 2007, it was reported that the claimant was going to the gym for 6-8 hours a day to use the sauna and workout.  (Exhibit 9F pages 21, 67, 69, 75, 55, and 90-91).  It is specifically noted that on June 21, 2007, it was reported that the claimant had difficulty taking responsibility for himself and used his mental health issues as a means to get what he wanted.  (Exhibit 9F page 50).  These findings are indicative that the claimant's complaints are not fully substantiated by the objective medical conclusions and his symptoms may not have been as limiting as the claimant has alleged in connection with this application.

Despite his testimony to the contrary, the record documents an extensive history of drug and alcohol abuse.  Progress notes reported on October 3, 2005, [indicate] that the claimant had used methamphetamine three weeks previously and marijuana four days previously.  (Exhibit 1F page 12).  On January 23, 2006, progress notes reported that the claimant had drank a small amount of vodka a week previously.  Progress notes reported on February 26, 2006, [indicate] that the claimant took up to four Benadryl and drank alcohol to sleep.  On January 12, 2007, it was reported that the claimant had been struggling with methamphetamine abuse, but had been clean for several months.  It was reported on July 2, 2007, that the claimant drank alcohol and [was] found to have a GAF of 45.  (Exhibit 9F pages 47-38, 102, 106, and 162).

The record also documents that the claimant has a repeated history of failure to comply with or follow-up on recommendations made by his treating physicians.  Progress notes on November 23, 2005, January 14, 2006, February 26, 2006, March 31, 2006, February 9, 2007, September 19, 2007, September 21, 2007, and October 1, 2007, reported that the claimant had missed numerous doctor's appointments and counseling appointments.  On March 20, 2007, it was reported that the claimant had stopped his community skills building class and gave many somatic complaints as reasons not to work toward his goal at that time.  It was reported on May 18, 2007, that the claimant had not been taking his medication as prescribed.  On August 20, 2007, it was reported that the claimant refused to do UDS and refused drug rehabilitation, therapy, and

support group.  (Exhibit 9F pages 9, 15-16, 27, 58, 79, 93, and 161-164).
Progress notes reported on February 26, 2006, that the claimant had
missed four doctor's appointments since November 22, 2005, and
cancelled other appointments and did not take his medications.  On
February 13, 2007, it was reported that he had not taken his medications
for a few days.  (Exhibit 9F pages 92 and 162).

The record fails to document that the claimant has been hospitalized for
his impairments or show that the claimant has received significant active
care other than for conservative routine maintenance.  After a close and
longitudinal examination of the record, including those documented
above, there emerges a clear pattern that when the claimant is compliant
with his medication regime and abstains from drug and alcohol abuse, he
improves considerably.  When he fails to take his medications and abuses
drugs and alcohol, his symptoms are aggravated.  (Exhibit 9F pages 58,
90, 92, and 162).  A review of the claimant's work history shows that the
claimant worked only sporadically prior to the alleged disability onset
date.  This raises a question as to whether the claimant's continuing
unemployment is actually due to medical impairments.  There have been
no significant increase or changes in prescribed medication reflective of an
uncontrolled condition, nor did the claimant describe side effects from his
medication that would prevent him from substantial gainful activity.
Furthermore, no treating or examining source determined that the
claimant's impairments were totally debilitating or rendered the claimant
completely unemployable.

The record includes evidence strongly suggesting that the claimant has
exaggerated symptoms and limitations.  The record includes statements by
doctors suggesting the claimant was engaging in possible malingering or
misrepresentation.  It is clear that the claimant is a manipulator and seeks
to avoid working and getting what he wants.  (Exhibit 9f page 50).  He has
no physical problems, per his testimony, and will try anything to avoid
working.  Despite reporting that the claimant was in remission, they
continued to report that the claimant drank alcohol as late as July 2, 2007.
(Exhibit 9F page 48).

The claimant has admitted certain abilities which provide support for part
of the residual functional capacity conclusion in this decision.  As noted
above, the claimant, his sister, and his examining physicians have
described daily activities which are not limited to the extent one would
expect, given the complaints of disabling symptoms and limitations.  The
overall evidence suggests that the claimant has the ability to care for
himself and maintain his home.  Furthermore, the performance of the
claimant's daily activities as described is not inconsistent with the
performance of many basic work activities.

* * *

. . . The claimant's testimony is given no credibility.

///

22

1  Plaintiff argues that the ALJ mischaracterized the evidence, picking and choosing only those

2  portions from the record which support the conclusion that plaintiff is not disabled.

3          The court tends to agree.  While the ALJ describes times when plaintiff was happy

4  and doing well, the record clearly demonstrates other times when plaintiff was not doing well.

5  This type of swing from a manic state to a depressed state is the hallmark of bipolar disorder and

6  appears to have been ignored by the ALJ who focused only on plaintiff's manic phases.  The ALJ

7  also erred in at least one respect in his characterization of the record.  Specifically, the ALJ states

8  in the hearing decision that there is no evidence that plaintiff has ever been hospitalized.  To the

9  contrary, the CAR establishes that plaintiff was admitted for psychiatric hospitalization on

10 August 7, 2007, on a "5150" by Dr. Zia.

11         The ALJ also cited plaintiff's sporadic working history pre-application as

12 evidence that plaintiff's mental impairment is not the cause of his alleged current inability to

13 work.  This observation seems somewhat unfair given that plaintiff was a young adult when the

14 application for benefits was filed and, as such, one would expect a sporadic work history pre-

15 application regardless of any mental impairment.  Further, it is just as likely that plaintiff's

16 mental impairments affected his ability to work prior to filing his application for benefits.

17         The ALJ also cites alcohol use in July 2007 as a reason not to believe plaintiff's

18 testimony.  This, again, strikes the court as unfair given that the only references to alcohol use in

19 the record are a time in February 2006 when plaintiff stated he had a drink to help him sleep and

20 the incident in July 2007 when plaintiff claims someone at a parade spiked his drink and

21 thereafter assaulted him, possibly sexually.  There is no other evidence of alcohol use during the

22 times covered by the record before the court.  Two occasions of alcohol use cannot be fairly

23 characterized as "abuse."

24 / / /

25 / / /

26 / / /

23

1       The ALJ also states that plaintiff does not describe adverse side effects of

2  medication.  Again, this is not consistent with the record.  Specifically, plaintiff's treatment

3  records from San Joaquin County Mental Health repeatedly refer to constant adjustments to

4  plaintiff's medication due to complaints of adverse side effects such as drowsiness.  Plaintiff also

5  described such adverse side effects in a function report submitted with his application.

6       While, as discussed above, the court tends to agree with plaintiff that the ALJ may

7  have been somewhat unfair in his characterization of plaintiff's testimony, the ALJ may properly

8  reject testimony as not credible where there are inconsistencies or apparent lies.  Such is the case

9  here.  The ALJ noted that plaintiff has stated several times that he stopped using

10 methamphetamine in September 2005.  However, treatment notes from January 2007 reflect that

11 plaintiff had been struggling with methamphetamine abuse and had been clean for a few months.

12 This suggests that, contrary to his statements that he stopped using methamphetamine in

13 September 2005, plaintiff was still using the drug as late as the end of 2006.  The ALJ was

14 entitled to discredit all of plaintiff's testimony based on this one inconsistency.

15              2.      Third-Party Statements

16      In determining whether a claimant is disabled, an ALJ generally must consider lay

17 witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

18 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

19 testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

20 evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

21 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

22 of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

23 919.

24 / / /

25 / / /

26 / / /

24

As to Ms. Copeland's statement, the ALJ stated:

. . . Jamie Copeland, the claimant's sister, reported in a third-party adult
function report that the claimant is able to watch television, take care of
his personal care, prepare meals, do laundry, pay bills, count change,
handle a savings account, use a checkbook and money orders, walk to the
corner store, listen to music, sing, and follow written and spoken
instructions.  (Exhibit 3E). . . . [¶] The claimant's sister reported that the
claimant visits and converses with family that he lives with.  (Exhibit 3E).

* * *

. . . As noted above, the claimant, his sister, and his examining physicians
have described daily activities which are not limited to the extent one
would expect, given the complaints of disabling symptoms and limitations.

The court finds that this discussion falls short of setting forth reasons germane to Ms. Copeland

for rejecting her statements as to plaintiff's functional abilities.  A remand is appropriate to allow

the ALJ to consider Ms. Copeland's statements in more detail.

**C.   Listing 12.04**

The Social Security Regulations "Listing of Impairments" is comprised of

impairments to fifteen categories of body systems that are severe enough to preclude a person

from performing gainful activity.  Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990); 20

C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they are

irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all

the requirements of that listing must be met.  Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir.

1985).

Regarding applicability of the Listing of Impairments, the ALJ stated:

The record does not report the existence of any functional limitations
and/or diagnostic test results, which would suggest that the impairments
meet or equal the criteria of any specific listing.  In addition, no treating or
examining physician has reported findings, which either meet or are
equivalent in severity to the criteria of any listed impairment, nor are such
findings indicated or suggested by the medical evidence of record.

The claimant's mental impairments, considered singly and in combination,
do not meet or medically equal the criteria of listings 12.04 or 12.09.  In
making this finding, the undersigned has considered whether the
"paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria,

25

1    the mental impairments must result in at least two of the following:
     marked restriction of activities of daily living; marked difficulties in
2    maintaining social functioning; marked difficulties in maintaining
     concentration, persistence, or pace; or repeated episodes of
3    decompensation, each of extended duration.  A marked limitation means
     more than moderate but less than extreme.  Repeated episodes of
4    decompensation, each of extended duration, means three episodes within 1
     year, or an average of once every 4 months, each lasting for at least 2
5    weeks.

6    Regarding daily living, the ALJ stated:

7          In activities of daily living, the claimant has no restriction.  The claimant
           reported in his adult function report on January 6, 2006, that he is able to
8          watch television, take care of his personal care, do laundry, pay bills, count
           change, handle a savings account, use a checkbook and money orders,
9          read, and listen to music.  (Exhibit 4E). . . .

10   The ALJ then discussed Ms. Copeland's third-party statement (outlined above) and continued as

11   follows:

12         . . .Dr. Richwerger reported on April 27, 2006, that the claimant stated that
           he had been cleaning a lot.  (Exhibit 2F page 3).  The claimant testified at
13         the hearing that he lived at Heart House and is able to prepare meals 2
           times a day, wash dishes once a week, vacuum/dust 3 times a week, do
14         laundry twice a month, go shopping with his sister once a month, change
           sheets once a month, make the bed daily, use a cell phone making 9-20
15         calls a day, and use a computer 1-2 hours a week.

16   As to social functioning, the ALJ stated:

17         In social functioning, the claimant has mild difficulties.  The claimant
           reported that he lived with his family.  (Exhibit 4E). . . . Progress notes
18         reported on October 3, 2005, that the claimant lived with his mother and
           sister.  (Exhibit 1F page 12).  Dr. Richwerger reported on April 27, 2006,
19         that the claimant lived with his family and had friends.  (Exhibit 2F page
           3).  The claimant testified that he lived in Heart House, worked in daily
20         activites with his sister, and watches his nephew when his sister is out.

21   The ALJ next addressed concentration, persistence, and pace:

22         With regard to concentration, persistence, or pace, the claimant has
           moderate difficulties.  His cognitive ability and memory are intact and the
23         medical reports indicate that he functions at a higher level that would
           allow him to do basic work activity.  The undersigned notes that the
24         claimant went into great detail answering his adult function report and
           disability report.  This is indicative of an ability to maintain an acceptable
25         level of concentration to perform at least simple tasks.

26   / / /

1  Finally, the ALJ addressed episodes of decompensation:

2             As for episodes of decompensation, the claimant has experienced no
              episodes of decompensation.  Although there are reports of overdose in the
3             record, (exhibit 9F page [omitted in original]), there is no real indication
              that this was a deliberate suicide attempt to permanently end his life.
4

5  As to the "paragraph B" criteria, the ALJ concluded:

6             Because the claimant's mental impairments do not cause at least two
              "marked" limitations or one "marked" limitation and "repeated" episodes
7             of decompensation, the "paragraph B" criteria are not satisfied.

8  The ALJ also addressed whether the evidence established any of the "paragraph C" criteria:

9             The undersigned has also considered whether the "paragraph C" criteria
              are satisfied.  In this case, the evidence fails to establish the presence of
10            the "paragraph C" criteria.  There are no extended episodes of
              decompensation and the claimant is not expected to decompensate with an
11            increase in mental demands.  Moreover, he does not need to live in a
              highly structured living arrangement.
12

13            For many of the reasons discussed above, the ALJ's listing analysis is flawed.  For

14  example, while the ALJ stated that plaintiff experienced no episodes of decompensation, the

15  record reflects at least one hospitalization in 2007.  As to daily living, the court finds that a

16  remand is necessary to allow the ALJ to consider statements from plaintiff and third party

17  sources as to plaintiff's daily activities.  In this regard, the current hearing decision appears to

18  focus only on those times when plaintiff was in a manic phase and ignores those times when

19  plaintiff reported severe depression.  As to concentration, persistence, and pace, the ALJ noted

20  that plaintiff's ability to provide detailed answers on an adult function report is "indicative of an

21  ability to maintain an acceptable level of concentration to perform at least simple tasks."  This

22  strikes the court as pure speculation given that the ALJ does not also state how long it took

23  plaintiff to complete his application.  For example, if it took plaintiff several days working only

24  minutes at a time to complete the paper work, such evidence could indicate an inability to

25  maintain concentration, persistence, or pace.  As to the "paragraph C" criteria, the ALJ stated that

26  there is no evidence that plaintiff requires a structured living environment.  However, the CAR

1    indicates that plaintiff lived in various structured and assisted living facilities over the years.

2        **D.      Hypothetical Questions**

3               Hypothetical questions posed to a vocational expert must set out all the

4    substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

5    Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

6    limitations, the expert's testimony as to jobs in the national economy the claimant can perform

7    has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

8    the ALJ may pose to the expert a range of hypothetical questions based on alternate

9    interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

10   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

11   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

12              Because the ALJ concluded that plaintiff has non-exertional limitations, a

13   vocational expert was called to testify.  The following exchange took place between the ALJ and

14   the vocational expert:

15                    Q:      For purpose of the following hypotheticals you should
                 assume your region is defined as the entire state of California.
16               Hypothetical number one will be a medium FRC.  Assume an individual
                 21 years of age, limited education, no work history and the following
17               restrictions.  He can lift, push/pull 25 frequently, 50 occasionally; walk,
                 stand, stoop, bend frequently, sit occasionally; could one return of the
18               previously, are there jobs in the regional economy such a person could
                 perform?  If so, what kind and how many?

19
                      A:      Yes, jobs such as, if a person has just general medium
20               restrictions as you –

21                    Q:      Right.

22                    A:      – hypothetically say, Judge, then they could do jobs such as
                 auto detailer, 915.687-034, it'd be medium SVP 2, about 15,000 in the
23               State of California.  They could do a job such as kitchen helper, 318.687-
                 010, medium SVP 2, 14,000; and hand packager, 920.587-018, it'd be
24               medium SVP 2, about 14,000 again, Judge.

25                    Q:      Assume for hypothetical number two these non-exertionals.
                 He is, he is slightly limited in attention, concentration, understanding, and
26               memory.  Vision, hearing, reaching, fine and gross manipulative abilities

are all unlimited and intact.  He is slightly limited in the ability to do a simple, routine task.  Environmentally no restrictions, unlimited contact with public, occasional supervision, physical pain slight at most.  Of the previously mentioned what percent erosion?

A:      No significant erosion, Judge.

Q:      Assume for hypothetical number 2A that he is going to be moderately limited in understanding and memory but only slightly limited in attention and concentration.  Of the previously mentioned other jobs what percent erosion?

A:      These are pretty basic jobs.  I would say no significant impact on these basic jobs, Judge.

Q:      Assume for hypothetical number 2B that he is going to be also moderately limited in attention, concentration as well as understanding and memory but would remain only slightly limited in the ability to do SRT.  Of the previously mentioned what percent erosion?

A:      Probably eliminate the kitchen helper.  Hand packager would be intact, very basic job.  Auto detailer I'd probably eliminate about half the jobs, Judge.

Q:      Assume for hypothetical number 2C that he is going to be moderately limited in the ability to do a simple, routine repetitive task and would require close supervision, close being two hours or more per shift.  Of the previously mentioned what percent?

A:      I'd eliminate the work at that level, Judge.

Q:      Assume for hypothetical number three a light RFC.  Assume an individual 21 years of age, limited education, work history as described and the following restrictions.  He can lift, push, pull 20 occasionally, 10 frequently; walk/stand frequently; sit, stoop, or bend occasionally.  Are there jobs in the regional economy?  If so, what kind and how many?

A:      If a person has just a general light restriction they would be able to do jobs such as fast food worker, 311.472-010, light SVP 2, about 32,000.  A job such as mail clerk would fit with a general light restriction, Judge.  Let's see, that is DOT 209.687-026, light SVP 2, about 10,000; and let's say housekeeping job, 323.687-014, light SVP 2, about 75,000, Judge.

Q:      Assume for hypothetical number four these non-exertionals.  He is slightly limited in attention, concentration, understanding and memory.  Vision, hearing, reaching, fine and gross manipulative abilities are all intact and unlimited.  He is slightly limited in the ability to do SRT.  Environmentally no restriction; unlimited contact with public; occasional supervision; pain slight at most.  Of the previously

1   mentioned other jobs what percent erosion?

2          A:     I would not see a significant erosion at the slight level,
    Judge.

3
           Q:     Assume for hypothetical number 2A that he's going to be
4   moderately limited in understanding and memory but remain only slightly
    limited in attention and concentration and slightly limited in the ability to
5   do SRT.  Of the previously mentioned what percent erosion?

6          A:     [Under]standing and memory, I'd probably eliminate about
    half the fast food work.  I think mail clerk and housekeeping would still be
7   intact.

8          Q:     Assume for hypothetical number 2B that he is also
    moderately limited in attention and concentration as well as understanding
9   and memory but again remains only slightly limited in the ability to do
    SRT.  Of the previously mentioned what percent?

10
           A:     I'd eliminate the fast food work I think.  Mail clerk, let me
11  look at these.  I'd eliminate all except the housekeeping.  Probably
    eliminate half of those.

12
           Q:     Assume for hypothetical number 4C that he is going to
13  require close supervision, close being two hours or more per shift and
    would be moderately limited in the ability to do SRT.  Of the previously
14  mentioned what percent?

15         A:     I'd eliminate the work at that level, Judge.

16  Plaintiff's attorney did not ask the vocational expert any questions.

17         For the reasons discussed above, the court finds that the hypothetical questions

18  posed to the vocational expert did not necessarily accurately describe plaintiff's limitations.  It is

19  possible that on remand the ALJ will reach different conclusions as to plaintiff's daily activities

20  and/or ability to maintain persistence, concentration, and pace.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

**V. CONCLUSION**

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 24) is granted;

2.      Defendant's cross-motion for summary judgment (Doc. 28) is denied;

3.      The matter is remanded for further administrative proceedings consistent with this opinion; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:  April 7, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE